David Donahue (*ddonahue@fzlz.com*)
Jason D. Jones (*jjones@fzlz.com*)
Daniel M. Nuzzaci (*dnuzzaci@fzlz.com*)
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
151 West 42nd Street, 17th Floor
New York, New York 10036
Phone: (212) 813-5900

*Counsel for Plaintiff UMG Recordings, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UMG RECORDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> OPENDEAL INC. D/B/A REPUBLIC, <br><br> Defendant. | Case No. 1:21-cv-9358-AT |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS ...........................................................................................................2

I.      Plaintiff's REPUBLIC Label and REPUBLIC Marks..................................................2

II.     Plaintiff's Trademark Registrations...............................................................................5

III.    Defendant's Infringing Activity......................................................................................6

        A.      Defendant's Non-Music Related Investment Services.............................................6

        B.      Defendant's New Expansion Into Music-Related Services ......................................7

IV.     Defendant's Infringing Conduct Has Already Caused Confusion.......................................9

V.      Plaintiff's Unsuccessful Good-Faith Attempts to Reach An Amicable Resolution .........12

ARGUMENT ...............................................................................................................................13

I.      The Standard for Relief..................................................................................................13

II.     Plaintiff Is Likely to Succeed on the Merits Of Its Claims..............................................13

        A.      Plaintiff's REPUBLIC Marks Are Valid and Protectable .....................................14

        B.      Defendant's REPUBLIC Marks Are Likely to Cause Confusion .........................15

                1.      Plaintiff's REPUBLIC Marks Are Strong....................................................16

                2.      The Parties' REPUBLIC Marks Are Identical and/or Highly Similar........17

                3.      The Parties' Services Are Competitive and In Many Respects
                        Identical and Offered to the Same Consumers.............................................18

                4.      The Quality of Defendant's Services Factor Favors Plaintiff ....................21

                5.      There Is No Gap to Bridge Since the Parties' Services are
                        Competitive and In Many Respects Identical................................................21

                6.      The Sophistication of Consumers Factor Favors Plaintiff ..........................22

                7.      Actual Confusion Occurred Instantly...........................................................23

                8.      Defendant Acted in Bad Faith ......................................................................25

                9.      The Balance of the *Polaroid* Factors Weighs in Plaintiff's Favor..............25

III.    Plaintiff Is Suffering Irreparable Harm..........................................................................26

IV.     The Balance of Hardships Tips Decidedly in Plaintiff's Favor ..........................................29

V.      The Public Interest Would Be Served by the Requested Injunctive Relief ......................30

CONCLUSION .................................................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Alzheimer's Disease & Related Disorders Association, Inc. v. Alzheimer's Foundation of
America, Inc.*, 307 F. Supp. 3d 260 (S.D.N.Y. 2018) ............................................................16

*American Automobile Association, Inc. v. Limage*,
15-CV-7386 (NGG)(MDG), 2016 WL 4508337 (E.D.N.Y. Aug. 26, 2016) .........................21

*Arrow Fastener Co. v. Stanley Works*,
59 F.3d 384 (2d Cir. 1995)....................................................................................................21

*Atlantic Richfield Co. v. Arco Globus International Co.*,
43 U.S.P.Q.2d 1574 (S.D.N.Y. 1997)....................................................................................17

*Cadbury Beverages, Inc. v. Cott Corp.*,
73 F.3d 474 (2d Cir. 1996)............................................................................................... 15-16

*Cline v. 1-888-PLUMBING Group, Inc.*,
146 F. Supp. 2d 351 (S.D.N.Y. 2001)...................................................................................19

*Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*,
841 F. Supp. 1339 (E.D.N.Y. 1994) .....................................................................................27

*Easy Spirit, LLC v. Skechers U.S.A., Inc.*,
515 F. Supp. 3d 47 (S.D.N.Y. 2021)......................................................................................21

*Edom Laboratories, Inc. v. Special Tea Plus, Inc.*,
09-CV-5185 (SJF)(ETB), 2010 WL 596342 (E.D.N.Y. Feb. 16, 2010) ................................30

*Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*,
897 F.3d 413 (2d Cir. 2018)...................................................................................................15

*Goldic Electrical, Inc. v. Loto Corp.*,
00-CV-0028 (DC), 2000 WL 1880327 (S.D.N.Y. Dec. 28, 2000).........................................28

*Grand Heritage Management, LLC v. Murphy*,
06-CV-5977 (NRB), 2007 WL 3355380 (S.D.N.Y. Nov. 7, 2007).........................................23

*Heritage of Pride, Inc. v. Matinee NYC, Inc.*,
14-CV-4165 (CM), 2014 WL 12783866 (S.D.N.Y. June 20, 2014) ......................................24

*Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.*,
428 F.2d 379 (2d Cir. 1970)...................................................................................................18

*International Information System Security Certification Consortium, Inc. v. Security
University, LLC*, 823 F.3d 153 (2d Cir. 2016).........................................................................16

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
113 F.3d 373 (2d Cir. 1997)...................................................................................................23

*Lane Capital Management, Inc. v. Lane Capital Management, Inc.*,
192 F.3d 337 (2d Cir. 1999)...........................................................................................14, 17

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*,
 426 F.3d 532 (2d Cir. 2005)..............................................................................17-18

*MasterCard International Inc. v. Nader 2000 Primary Committee, Inc.*,
 70 U.S.P.Q.2d 1046 (S.D.N.Y. 2004)......................................................................23

*Microban Products Co. v. API Industries, Inc.*,
 14-CV-0041 (KPF), 2014 WL 1856471 (S.D.N.Y. May 8, 2014) ........................25

*Morningside Grp. Ltd. v. Morningside Capital Group, L.L.C.*,
 182 F.3d 133 (2d Cir. 1999)...........................................................................23, 24

*Museum of Modern Art v. MOMACHA IP LLC*,
 339 F. Supp. 3d 361 (S.D.N.Y. 2018) ..............................................................18-19

*North American Soccer League, LLC v. United States Soccer Federation, Inc.*,
 883 F.3d 32 (2d Cir. 2018)...................................................................................13

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
 704 F. Supp. 2d 305 (S.D.N.Y. 2010) ............................................................ *passim*

*Nikon, Inc. v. Ikon Corp.*,
 803 F. Supp. 910 (S.D.N.Y. 1992)..........................................................................16

*Omega Importing Corp. v. Petri-Kine Camera Co.*,
 451 F.2d 1190 (2d Cir. 1971)................................................................................28

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
 317 F.3d 209 (2d Cir. 2003)..................................................................................24

*Polaroid Corp. v. Polarad Electrics Corp.*,
 287 F.2d 492 (2d Cir. 1961)..................................................................................16

*Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*,
 754 F.2d 91 (2d Cir. 1985)....................................................................................27

*Really Good Stuff, LLC v. BAP Investors, L.C.*,
 813 F. App'x 39 (2d Cir. 2020) ......................................................................26, 29

*Rise&Shine Corp. v. Pepsico, Inc.*,
 21-CV-6324 (LGS), 2021 WL 5173862 (S.D.N.Y. Nov. 4, 2021) .................14, 26

*Rosenthal A.G. v. Ritelite, Ltd.*,
 986 F. Supp. 133 (E.D.N.Y. 1997) ........................................................................22

*Savin Corp. v. Savin Group*,
 391 F.3d 439 (2d Cir. 2004)..................................................................................23

*Star Industries, Inc. v. Bacardi & Co.*,
 412 F.3d 373 (2d Cir. 2005)............................................................................21-22

*Tiffany & Co. v. Costco Wholesale Corp.*,
 971 F.3d 74 (2d Cir. 2020)...................................................................................14

*Time, Inc. v. Petersen Publishing Co.*,
    173 F.3d 113 (2d Cir. 1999)....................................................................................17

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992)............................................................................................17

*Upjohn Co. v. America Home Products Corp.*,
    598 F. Supp. 550 (S.D.N.Y. 1984).....................................................................28

*Virgin Enterprises Ltd. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003).......................................................................... *passim*

*Vox Amplification Ltd. v. Meussdorffer*,
    13-CV-4922 (ADS)(GRB), 2014 WL 558866 (E.D.N.Y. Feb. 11, 2014)..............30

*Vox Amplification Ltd. v. Meussdorffer*,
    50 F. Supp. 3d 355 (E.D.N.Y. 2014) .................................................................30

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275 (2d Cir. 2012)...............................................................................26

*Winter v. National Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)...............................................................................................29

## STATUTES

15 U.S.C. § 1065 ............................................................................................................6

15 U.S.C. § 1072 ............................................................................................................6

15 U.S.C. § 1114 ..........................................................................................................13

15 U.S.C. § 1115 ............................................................................................................6

15 U.S.C. § 1116 ..........................................................................................................26

15 U.S.C. § 1125 ..........................................................................................................13

## RULE

Fed. R. Civ. P. 65 ...........................................................................................................1

## TREATISE

J. Thomas McCarthy,
    MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed. 2021) .......................13, 15

Plaintiff UMG Recordings, Inc. ("Plaintiff"), owner of the world-renowned REPUBLIC RECORDS label and the REPUBLIC and REPUBLIC RECORDS trademarks, submits this memorandum of law in support of its motion for a preliminary injunction (the "Motion"), pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, enjoining Defendant OpenDeal Inc. d/b/a Republic ("Defendant") from using the marks REPUBLIC and/or REPUBLIC MUSIC in connection with music-related goods and services during the pendency of this lawsuit. In further support of its Motion, Plaintiff submits the Declaration of Avery Lipman, dated January 20, 2022 (the "Lipman Decl."), the Declaration of Brent LaBarge, dated January 21, 2022 (the "LaBarge Decl."), the Declaration of Daniel M. Nuzzaci, dated January 21, 2022 (the "Nuzzaci Decl."), and the accompanying exhibits attached thereto.

## PRELIMINARY STATEMENT

The need for preliminary injunctive relief is stark and straightforward. Plaintiff owns the iconic REPUBLIC RECORDS label—often referred to simply as "REPUBLIC"—which is widely regarded as the most commercially-successful label of the past decade and is today home to an all-star roster of multi-platinum, award-winning artists such as Ariana Grande, Taylor Swift, Drake, Pearl Jam, The Weeknd, Jonas Brothers, Stevie Wonder, and John Mellencamp. Moreover, the REPUBLIC label was recently named the "Top Label of the Year" for 2021 by *Billboard* magazine—an honor REPUBLIC has held for five of the last seven years.

Despite Plaintiff's strong trademark rights, Defendant recently launched a new music investment service—which it calls REPUBLIC and/or REPUBLIC MUSIC—that allows fans to purchase a security interest in a forthcoming song by an artist they like. When it launched this new service, Defendant issued a "manifesto" claiming that its new services are designed to "cut out the middleman" between fans and artists—namely, the record label. Defendant also markets its REPUBLIC music services to artists, managers, and labels, making the claim that "the fans

are your new *record label*." But the problem with Defendant's plan is crystal clear: there already *is* a record label called REPUBLIC, namely Plaintiff's REPUBLIC label. Thus, it is not surprising that in the short amount of time after Defendant launched its REPUBLIC-branded music services there were numerous instances of confusion. Members of the public, including sophisticated professionals and trade industry publications, either (i) mistakenly believed that the music-related services offered by Defendant under the name REPUBLIC originate from or are sponsored by Plaintiff, or (ii) acknowledged that such confusion is likely.

Defendant's actions are causing and will continue to cause consumer confusion and immediate and irreparable damage to Plaintiff's invaluable trademark rights. Accordingly, Plaintiff seeks a preliminary injunction enjoining Defendant from using the mark REPUBLIC in connection with music-related goods and services during the pendency of this lawsuit.[1]

## STATEMENT OF FACTS

**I.**      **Plaintiff's REPUBLIC Label and REPUBLIC Marks**

Plaintiff is part of Universal Music Group, the world's largest music company with leading market positions in recorded music, music publishing, and merchandising. (Lipman Decl. ¶ 5.) Plaintiff owns some of the most iconic and influential record labels in the industry, including the world-renowned REPUBLIC RECORDS label. (*Id.*) Because the consuming public, music industry professionals, and the label itself have often referred to REPUBLIC RECORDS simply as "REPUBLIC" for over twenty-five years (*id.* ¶¶ 6-9 & Exs. A-D; Nuzzaci

---

[1] Plaintiff seeks a preliminary injunction rather than a temporary restraining order because (i) Defendant's counsel represented in mid-December 2021 that, apart from the music investment opportunity Defendant launched in November 2021 (*infra* pp. 8-9), Defendant did not intend to release any new music investment opportunities before the end of 2021, and (ii) Plaintiff has not launched any further music investment opportunities to date in 2022. However, a preliminary injunction is still needed because Defendant has made clear that it will not cease use of REPUBLIC in connection with music-related services while this lawsuit is pending unless it is enjoined by this Court. (ECF No. 17 at 3-5; *see also infra* pp. 12-13, 28-29.)

Decl. ¶¶ 2-6 & Exs. A-E), Plaintiff owns rights in the REPUBLIC mark as well as the

REPUBLIC RECORDS mark.[2]

Even among the many storied labels owned by Universal Music Group, Plaintiff's

REPUBLIC label stands out as perhaps the most innovative, creative, and commercially-

successful label of the past decade. (Lipman Decl. ¶ 10.) Founded in 1995, REPUBLIC is home

to an all-star roster of multi-platinum, award-winning music superstars, including Ariana Grande,

Nicki Minaj, Taylor Swift, Drake, Jonas Brothers, Pearl Jam, Post Malone, Stevie Wonder, The

Weeknd, Lil Wayne, Lorde, John Mellencamp, Florence + the Machine, Greta Van Fleet, Hailee

Steinfeld, Jack Johnson, James Blake, James Bay, Jessie J, Julia Michaels, Kid Cudi, Metro

Boomin, NAV, Of Monsters and Men, and many more. (*Id.* ¶ 11.)

Under the marks REPUBLIC and REPUBLIC RECORDS (together, "Plaintiff's

REPUBLIC Marks"), Plaintiff helps artists around the world by coordinating the production,

manufacture, distribution, marketing, and promotion of their sound recordings and music videos.

(Lipman Decl. ¶ 12.) These artists rely upon Plaintiff to broaden their fan base, market their

albums, sell their merchandise, and promote their singles on streaming services, radio, and

television. (*Id.*) As a record label, REPUBLIC actively scouts and works to develop upcoming

talent and new artists. (*Id.* ¶ 13.) The label also invests in numerous third parties, including

ventures and labels owned by its artists, managers, and other entrepreneurs and innovators. (*Id.*

¶ 14.) Many of these labels and companies are award-winning in their own right. (*Id.*)

Plaintiff prominently uses Plaintiff's REPUBLIC Marks in connection with its musical

goods and services, including sound recordings, musical performances, and ancillary

merchandise. (Lipman Decl. ¶ 15.) Plaintiff's REPUBLIC Marks prominently appear on album

---

[2] Unless otherwise indicated, Plaintiff will refer to the label herein as "REPUBLIC" or "REPUBLIC label."

covers for artists signed to the REPUBLIC label and throughout Plaintiff's website at *www.republicrecords.com* and social media accounts. (*Id.* & Exs. C-D.) In the last few years alone, Plaintiff has released numerous prominent and well-received albums from artists signed to REPUBLIC, such as Ariana Grande (2018's *Sweetener*, 2019's *Thank U, Next*, and 2020's *Positions*); Taylor Swift (2019's *Lover*, and 2020's *Folklore* and *Evermore*); Drake (2021's *Certified Lover Boy*); Shawn Mendes (2020's *Wonder*); Jonas Brothers (2019's *Happiness Begins*); The Weeknd (2016's *Starboy*, and 2020's *After Hours*); Lorde (2013's *Pure Heroine* and 2017's *Melodrama*); and Pearl Jam (2020's *Gigaton*), just to name a few. (*Id.* ¶ 16.)

Press coverage and awards for both REPUBLIC and its artists have further enhanced the recognition and reputation of Plaintiff's REPUBLIC Marks. (Lipman Decl. ¶ 17.) For example, in 2021, for the first time in its history, REPUBLIC topped *all three* of *Billboard*'s leading year-end label rankings: 2021 year-end Top Labels chart; Billboard 200 Labels chart; and Billboard Hot 100 Labels chart. (*Id.* & Ex. A.) These awards are just the latest in a decade of accolades from *Billboard*, the music industry's magazine of record. (*Id.* ¶ 18.) The magazine has crowned REPUBLIC the "Top Label of the Year" in 2015, 2016, 2018, 2019, and 2021, and the top "Hot 100" label now *eight* times in the past decade. (*Id.* & Ex. E.) Adding to these superlatives, in 2021, REPUBLIC won label of the year at the inaugural *Clio Music of the Year Awards* (which are dedicated to excellence in music marketing and promotion). (*Id.* ¶ 19 & Ex. F.) REPUBLIC also garnered significant attention in 2018 when Taylor Swift announced that she would be joining the record label after spending thirteen years at her prior label. (*Id.* ¶ 20.) This transition was publicized in the media and received praise for putting artists first. (*Id.* & Ex. G.)

In addition to the substantial praise and numerous awards received by REPUBLIC, the goods and services offered under Plaintiff's REPUBLIC Marks have achieved considerable

commercial success in the United States. (Lipman Decl. ¶ 21.) The label's annual net sales from 2018 to 2020 exceeded hundreds of millions of dollars. (*Id.*)

Like many other companies, Universal Music Group has also begun expanding into the non-fungible token ("NFT") space. (Lipman Decl. ¶ 22.) The company is in talks with leading innovators in the NFT space to sell unique artwork, music, and content associated with all of the labels under its umbrella—including REPUBLIC. (*Id.*) For example, Universal Music Group recently announced that it had signed the musical group Kingship—which is not an actual artist but rather a collection of four anthropomorphic NFTs—to its next-generation Web3 label called 10:22PM. (Nuzzaci Decl. ¶ 7 & Ex. F.) REPUBLIC itself also has facilitated the sale of NFTs by its artist The Weeknd. (Lipman Decl. ¶ 22.) Universal Music Group and REPUBLIC expect to continue to find similar opportunities for its labels and artists in the months to come. (*Id.*)

Plaintiff has invested a significant amount of time, effort, and money developing and selling its goods and services under Plaintiff's REPUBLIC Marks. (Lipman Decl. ¶ 23.) As a result of these efforts and the unparalleled success of Plaintiff's offerings, Plaintiff's REPUBLIC Marks have come to identify Plaintiff exclusively and uniquely in the music industry, represent enormous goodwill, and are some of Plaintiff's most valuable assets. (*Id.*)

## II.     Plaintiff's Trademark Registrations

In addition to Plaintiff's extensive common law rights in Plaintiff's REPUBLIC Marks built up through decades of use in the United States—and to protect its substantial investment in the REPUBLIC RECORDS mark—Plaintiff has secured and maintains registrations from the U.S. Patent and Trademark Office ("USPTO") for the REPUBLIC RECORDS trademark. (LaBarge Decl. ¶ 4.) Specifically, the USPTO has issued to Plaintiff the following trademark registrations:

| Mark | Reg. Nos. | Goods and Services |
|---|---|---|
| REPUBLIC RECORDS | 5,417,675<br>5,417,677 | "Musical sound recordings; downloadable musical sound recordings" in International Class 9; |
| **republic**<br>records ▬ | *5,073,418<br>*5,073,419 | "Production and publishing of music; providing online entertainment, namely, providing non-downloadable musical sound recordings; audio and sound recording and production; record production; entertainment in the nature of live concerts and performances by musical artists and groups; entertainment services, namely, providing on-line reviews of music and musical artists; entertainment services, namely, providing information in the field of music, and commentary and articles about music, all on-line via a global computer network; conducting entertainment exhibitions in the nature of music festivals" in International Class 41. |

(LaBarge Decl. ¶¶ 4-5 & Ex. A.) These registrations are valid and subsisting and serve as *prima facie* proof of Plaintiff's exclusive right to use the marks in connection with the goods and services identified in the registrations, as provided by Section 33(a) of the Lanham Act, 15 U.S.C. § 1115(a). Moreover, the two registrations marked with an asterisk (*) have become incontestable pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065 and, therefore, serve as *conclusive* evidence of the validity of the marks, of Plaintiff's ownership of the marks, and of Plaintiff's exclusive right to use the marks in connection with the goods and services identified in those registrations. *See* 15 U.S.C. § 1115(b). Plaintiff's registrations also placed Defendant on constructive notice of Plaintiff's rights in Plaintiff's REPUBLIC Marks. *See* 15 U.S.C. § 1072.

### III.     Defendant's Infringing Activity

#### A.     Defendant's Non-Music Related Investment Services

Defendant—which does business under the name Republic—was formed in April 2016 and since that time has operated as a multi-asset investment platform that provides investing

opportunities for consumers in sectors such as real estate, cryptocurrency, and blockchain technologies. (Nuzzaci Decl. ¶ 8 & Ex. G.) Plaintiff does not object to Defendant's past or present use of the trade name or trademark REPUBLIC in these non-confusing contexts. Rather, Plaintiff's sole concern is with Defendant's recent expansion into the music industry.

> **B.**     **Defendant's New Expansion Into Music-Related Services**

On October 6, 2021, Defendant announced the launch of its new music investment service, which it calls REPUBLIC and/or REPUBLIC MUSIC (together, "Defendant's REPUBLIC Marks"). (Lipman Decl. ¶ 25; LaBarge Decl. ¶¶ 6-7 & Exs. B-C; Nuzzaci Decl. ¶ 9 & Ex. H.) Defendant did so without any authorization from Plaintiff, notwithstanding Plaintiff's longstanding prior rights in Plaintiff's REPUBLIC Marks for music-related goods and services. (Lipman Decl. ¶¶ 25, 28; LaBarge Decl. ¶¶ 4-5 & Ex. A.)

According to Defendant, its new REPUBLIC-branded music services allow fans to "invest in the music you love." (LaBarge Decl. ¶ 6 & Ex. B; Nuzzaci Decl. ¶ 10 & Ex. I.) Specifically, the services offered and/or intended to be offered under Defendant's REPUBLIC Marks are a "way for artists to raise capital from their fans through investing and in exchange, the fans receive equity in the rights to the royalties" of an artist's forthcoming songs. (LaBarge Decl. ¶ 7 & Ex. C.) These new services offered under Defendant's REPUBLIC Marks operate in partnership with a blockchain platform called Opulous and allow fans and other investors to purchase a Security Non-Fungible Token ("S-NFT")—*i.e.*, a security interest—in a forthcoming song by an artist. (*Id.* ¶¶ 6-7 & Exs. B-C.) Defendant promises investors "royalties" each time the song is streamed in the future as well as access to "exclusive perks" such as "tickets, merch[andise], special events and more from the artists they back." (LaBarge Decl. ¶ 6 & Ex. B; Nuzzaci Decl. ¶ 10 & Ex. I.) Defendant also markets its REPUBLIC music services to artists,

managers, and labels, making the claim that "the fans are your new *record label*." (LaBarge Decl. ¶ 6 & Ex. B) (emphasis added).

In other words, Defendant is using a mark identical to Plaintiff's REPUBLIC mark to compete with Plaintiff for a full suite of music-related goods and services that *record labels* typically offer, ranging anywhere from sound recordings, merchandise, event tickets, and royalty payments, to investments in artists and their ventures. (Lipman Decl. ¶ 27.) In fact, in the "manifesto" accompanying the launch of its new REPUBLIC-branded music services, Defendant boasted that the services are designed to "cut out the middleman"—namely, the record label. (*Id.*; LaBarge Decl. ¶ 6 & Ex. B; Nuzzaci Decl. ¶ 11 & Ex. J.) According to Defendant, artists can use Defendant's new services to avoid the kinds of "unfair contracts" and "underhanded deals" that some artists have signed in the past with record labels. (Nuzzaci Decl. ¶ 11 & Ex. J.) As an example of an artist who was purportedly able to escape an "unfair contract," Defendant's manifesto mentions Taylor Swift—an artist who is now signed to Plaintiff's REPUBLIC label after leaving her prior label in 2018. (*Id.*)

Defendant's website features two artists that have forthcoming songs in which investors have previously invested (or can soon invest) through Defendant's REPUBLIC-branded music services—namely, the artists Lil Pump and KSHMR. (LaBarge Decl. ¶ 6 & Ex. B; Nuzzaci Decl. ¶ 10 & Ex. I.) Lil Pump performs rap music and KSHMR produces electronic dance music ("EDM")—two genres of music for which Plaintiff's REPUBLIC label is also well known. Specifically, the REPUBLIC label is home to rap superstars such as Drake and Nicki Minaj and to EDM artists such as Martin Solveig and Swedish House Mafia. (Lipman Decl. ¶ 11.)

On November 4, 2021, Defendant officially launched its REPUBLIC-branded music services when it opened investing to consumers on the new song *Mona Lisa* by Lil Pump.

(Nuzzaci Decl. ¶ 12 & Ex. K.) Defendant met its maximum fundraising goal of $500,000 within a few hours after investing opened, and the Lil Pump investing opportunity is listed as "SOLD OUT!" on Defendant's website. (*Id.*) Customer complaints in the comments section of the *Mona Lisa* investment page reveal that Defendant's launch did not, however, go smoothly and was riddled with complications and poorly-explained instructions. (*Id.*) Defendant's website also previewed Lil Pump's upcoming *Mona Lisa* song, set forth his biography, and displayed photographs of his past collaborators—even though these past collaborators have nothing to do with the forthcoming *Mona Lisa* song in which consumers invested. (Nuzzaci Decl. ¶ 12 & Ex. K.) Moreover, two of the collaborators shown on Lil Pump's page are artists currently signed to REPUBLIC, namely Nicki Minaj and Drake, and at least two more are or were signed to other Universal Music Group labels. (*Id.*; Lipman Decl. ¶ 11.) Defendant also advertised that the KSHMR investing opportunity would be "Dropping Soon," though it has not launched as of the filing of this motion. (LaBarge Decl. ¶ 6 & Ex. B; Nuzzaci Decl. ¶ 10 & Ex. I).

**IV.**   **Defendant's Infringing Conduct Has Already Caused Confusion**

In the short time since Defendant began using Defendant's REPUBLIC Marks in connection with its new music-related services, there have already been numerous instances of actual confusion in which members of the public—including sophisticated professionals and trade industry publications—have either (i) mistakenly believed that the music-related services offered under Defendant's REPUBLIC Marks originated from or are sponsored by Plaintiff's REPUBLIC label, or (ii) acknowledged that such confusion is likely. (LaBarge Decl. ¶ 8.)

For example, *Music Business Worldwide* is a trade industry database that collects and catalogs news stories on various artists, labels, and topics in the music industry. (LaBarge Decl. ¶ 9.) *Music Business Worldwide* has a webpage dedicated to REPUBLIC RECORDS that

includes a section called "REPUBLIC RECORDS IN THE NEWS." (*Id.*) However, in mid-October 2021, *Music Business Worldwide* mistakenly included two articles published about *Defendant's* REPUBLIC-branded services in the "REPUBLIC RECORDS IN THE NEWS" section of the REPUBLIC RECORDS webpage. (*Id.* & Ex. D.) In other words, *Music Business Worldwide* mistakenly thought that the articles about Defendant's REPUBLIC-branded music services were about Plaintiff's REPUBLIC label.

Moreover, *CoinDesk*—an online publication that provides news and information on digital currencies such as bitcoin and its underlying technology—published an article on October 6, 2021, about the launch of Defendant's new music services. (LaBarge Decl. ¶ 10.) The first sentence of the article reads:

> Republic – *the financial services company, not the record label* – has announced the launch of 'Republic Music,' a loosely defined investment product that claims to offer 'an entirely new way to create, produce and share royalties from music.'

(*Id.* & Ex. E) (emphasis added). Similarly, when *Music Ally*—an online website that provides a variety of services to assist consumers with learning about and navigating the music industry—published an article about Opulous's collaboration with Defendant, it stated "Now [Opulous] is exploring [selling music NFTs] through a partnership with Republic. No, *not the major label imprint (imagine!)*, but a company that runs a startups investment platform." (*Id.* ¶ 11 & Ex. F) (emphasis added). In other words, these two sophisticated industry publications recognized the high likelihood that its readers would mistakenly think that services offered under Defendant's REPUBLIC Marks were related to Plaintiff's REPUBLIC label and, thus, felt the need to clarify at the outset that Defendant's REPUBLIC-branded services were not the REPUBLIC label.

The industry publications' fears are well-founded, as consumers have already been confused. For example, in a tweet dated October 19, 2021, Twitter user @CanaryJulz tweeted

four images from Defendant's website regarding the launch of Defendant's REPUBLIC-branded music services, and accompanied the tweet with the following statement: "So Producers . . . _Republic Records_ is about to launch a platform where you can invest into songs dropping by MAJOR artists & share in the royalties/splits & rights of the songs . . . just like you can invest into #crypto & #NFTs … Thoughts??" (LaBarge Decl. ¶ 12 & Ex. G) (emphasis added.) This Twitter user also "tagged" Plaintiff's Republic Twitter account in her post. (_Id._)

Even NFT-industry executives have been confused. On November 11, 2021—roughly one week after Defendant opened investing on Lil Pump's song _Mona Lisa_ on its REPUBLIC-branded music investing website—an executive of Plaintiff's REPUBLIC label had a meeting with a company called NiftyLabs to discuss opportunities in the blockchain/cryptocurrency space for REPUBLIC and its artists. (Lipman Decl. ¶ 30.) During that meeting, a NiftyLabs executive complimented Plaintiff's executive on REPUBLIC's "Lil Pump initiative." (_Id._) After further discussion, Plaintiff's executive realized that the NiftyLabs executive was referring to _Defendant's_ recently-launched investment opportunity in Lil Pump's music. (_Id._)

As these examples show, due to Defendant's use of REPUBLIC for music-related services, relevant consumers have already been—and are likely to continue to be—confused, deceived, and misled as to the association of the parties and the origin of the parties' respective goods and services. These instances of actual confusion are not likely to be isolated incidents. (Lipman Decl. ¶ 31.) Defendant's REPUBLIC Marks are identical to Plaintiff's REPUBLIC Marks; are being used in connection with music-related services that are identical to and/or competitive with Plaintiff's music-related goods and services; and are targeted towards the exact same consumers—namely, artists, record labels, managers, agents, and fans. Under these circumstances, confusion and irreparable damage to Plaintiff are inevitable. (_Id._ ¶¶ 31-32.)

**V.   Plaintiff's Unsuccessful Good-Faith Attempts to Reach An Amicable Resolution**

On October 8, 2021—just two days after Defendant issued a press release announcing the creation of its new REPUBLIC-branded music services—Plaintiff sent a cease-and-desist letter to Defendant objecting to the use of Defendant's REPUBLIC Marks in connection with music-related services and requesting that Defendant operate its new music-related services under a non-REPUBLIC name. (LaBarge Decl. ¶ 13 & Ex. H.)

On October 11, 2021, Defendant's then-outside counsel responded by letter and stated that Defendant was open to pursuing an amicable resolution, initially leading Plaintiff to believe that Defendant would respect Plaintiff's longstanding rights and cease use of Defendant's REPUBLIC Marks in connection with its new music-related services. (LaBarge Decl. ¶ 14.) Throughout October 2021, the parties engaged in settlement negotiations and, in fact, reached principal terms on which they could possibly settle this dispute. (*Id.* ¶ 15.) However, on October 28, 2021, Defendant's new and current counsel contacted Plaintiff and stated that he was taking over representation of Defendant and that the proposed settlement terms that had previously been discussed would need to be revisited. (*Id.* ¶ 16.) Rather than continue the settlement discussions, on November 4, 2021, Defendant launched its new REPUBLIC-branded music services by opening the investment on Lil Pump's music. (*Id.* ¶ 17.) In light of Defendant's launch, Plaintiff filed the present lawsuit one week later on November 12, 2021. (*Id.* ¶ 18.)

Shortly thereafter, the parties renewed their settlement discussions in an attempt to amicably resolve this dispute. (LaBarge Decl. ¶ 19.) Those settlement discussions continued throughout November 2021, but did not lead to a resolution of the dispute. (*Id.*) To the contrary, despite claims in its pre-motion letter that it took down some (but not all) of its prior marketing materials for its REPUBLIC-branded music services (ECF No. 17 at 2-3)—including recently

taking down its *republic.co/music-investing* webpage—Defendant refuses to forego use of REPUBLIC in connection with music-related services while this lawsuit is pending and, to the contrary, has made clear that it intends to continue such use unless preliminarily enjoined by this Court. (*Id.* at 3-5.) Indeed, on January 11, 2022, Defendant's CEO boasted that Defendant has "brought music investing to the masses with major artists." (Nuzzaci Decl. ¶ 15 & Ex. N.)

## ARGUMENT

### I.     The Standard for Relief

Preliminary injunctive relief is warranted because Plaintiff will be irreparably damaged by losing control over the reputation of its REPUBLIC Marks if Defendant is permitted to continue to offer competitive (and in many respects *identical*) music services under an *identical* trademark. District courts routinely grant this kind of relief in similar cases. As the leading treatise explains: "Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. Such cases are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement." 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION ("MCCARTHY") § 23:20 (5th ed. 2021).

A plaintiff is entitled to a preliminary injunction if it can demonstrate "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). Because Plaintiff can satisfy each of the above-mentioned elements, the Court should grant Plaintiff's request for a preliminary injunction.

### II.    Plaintiff Is Likely to Succeed on the Merits Of Its Claims

Plaintiff asserts claims for trademark infringement and unfair competition under Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), and is likely to succeed

on the merits. "Under the Lanham Act, a plaintiff alleging trademark infringement must demonstrate that (1) it has a valid mark that is entitled to protection and that (2) the defendant's actions are likely to cause confusion with [that] mark." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (internal quotation marks omitted). The same two-prong standard applies to unfair competition claims under Section 43(a) of the Lanham Act. *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). Both elements are satisfied here.[3]

### A.   Plaintiff's REPUBLIC Marks Are Valid and Protectable

"To be valid and protectable, a mark must be capable of distinguishing the products it marks from those of others." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999). Plaintiff owns valid and subsisting federal trademark registrations for the REPUBLIC RECORDS mark covering a variety of music-related goods and services and merchandise. (LaBarge Decl. ¶¶ 4-5 & Ex. A.) The registrations serve as *prima facie* evidence— and, as to the incontestable registrations, *conclusive* evidence—of the validity of the REPUBLIC RECORDS mark thereby satisfying the first prong of Plaintiff's trademark infringement and unfair competition claims. *See Tiffany & Co.*, 971 F.3d at 84 & n.4 (finding the "first prong of the infringement inquiry presumptively satisfied" because "[t]he Lanham Act treats trademark registration as conclusive evidence of the validity of the registered mark . . . ."); *Rise&Shine Corp. v. Pepsico, Inc.*, 21-CV-6324 (LGS), 2021 WL 5173862, at *5 (S.D.N.Y. Nov. 4, 2021) ("Because it is registered, [the plaintiff's] Mark is presumptively valid" and "Plaintiff is thus likely to prevail on the first element of its trademark claim.").

---

[3] While Plaintiff asserts New York State law for claims of trademark infringement, unfair competition, and dilution in its Complaint (ECF No. 1 at ¶¶ 63-75), this request for preliminary injunctive relief is based solely on Plaintiff's federal claims for trademark infringement and unfair competition under the Lanham Act.

Moreover, Plaintiff owns extensive common law rights in Plaintiff's REPUBLIC Marks by virtue of its continuous use of the marks in commerce in connection with music-related goods and services. For more than twenty-five years, Plaintiff has used its REPUBLIC Marks on album covers released by its all-star roster of multi-platinum, award-winning artists—albums which have achieved considerable commercial success and have generated significant annual sales. (Lipman Decl. ¶¶ 11-12, 15-16, 21.) Moreover, Plaintiff has extensively advertised and promoted its REPUBLIC Marks throughout the United States, and Plaintiff has received immeasurable amounts of press coverage and awards for both the REPUBLIC label and its artists. (*Id.* ¶¶ 17-20.) This evidence is more than sufficient to give rise to common law rights in Plaintiff's REPUBLIC Marks—rights that long predate Defendant's first use of REPUBLIC for *any* services. *See Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co.*, 897 F.3d 413, 418 (2d Cir. 2018) ("Common law trademark rights derive from initial appropriation and use accompanied by an intention to continue exploiting the mark commercially").

In its response to Plaintiff's pre-motion letter, Defendant incorrectly asserts that Plaintiff's rights are limited to REPUBLIC RECORDS and do not extend to REPUBLIC alone. (ECF No. 17 at 3.) To the contrary, Plaintiff itself, American consumers, and members of the music industry, often refer to Plaintiff's label as REPUBLIC. (Lipman Decl. ¶¶ 6-9 & Exs. A-D; Nuzzaci Decl. ¶¶ 2-6 & Exs. A-E.) The REPUBLIC mark is "just as entitled to legal protection as the original full trademark" REPUBLIC RECORDS. 1 MᴄCᴀʀᴛʜʏ § 7:18. Accordingly, Defendant cannot dispute Plaintiff's valid trademark rights in Plaintiff's REPUBLIC Marks.

### B.   Defendant's REPUBLIC Marks Are Likely to Cause Confusion

"Likelihood of confusion" means that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question" because of the defendant's use of its mark in connection with defendant's goods or services. *Cadbury Beverages, Inc. v.*

*Cott Corp.*, 73 F.3d 474, 477-78 (2d Cir. 1996). To determine whether a likelihood of confusion exists, courts apply the eight-factor *Polaroid* balancing test, which evaluates the (1) strength of the plaintiff's trademark; (2) similarity of the parties' marks; (3) relatedness of the parties' services; (4) quality of the defendant's services; (5) sophistication of the relevant consumers; (6) extent to which gaps in the services might be bridged; (7) evidence of actual confusion; and (8) defendant's intent. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). While courts consider each factor to determine the likelihood of confusion, "[n]o single factor is dispositive, and cases may certainly arise where a factor is irrelevant to the facts at hand." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016).

Here, application of these factors to Defendant's use of Defendant's REPUBLIC Marks in connection with its new music-related services reveals likely—if not inevitable—confusion.

### 1.    *Plaintiff's REPUBLIC Marks Are Strong*

Trademark strength "encompasses two different concepts," namely a mark's conceptual strength—*i.e.,* its "inherent distinctiveness"—and its commercial (*i.e.*, marketplace) strength. *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 147 (2d Cir. 2003). "A strong mark . . . casts a long shadow which competitors must avoid" and "enjoy[s] a wide latitude of legal protection." *Nikon, Inc. v. Ikon Corp.*, 803 F. Supp. 910, 915 (S.D.N.Y. 1992).

As to conceptual strength, marks are categorized on a spectrum of distinctiveness as either: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 287 (S.D.N.Y. 2018). Marks that are suggestive, arbitrary, or fanciful are deemed "inherently distinctive" and are automatically entitled to trademark protection because "their intrinsic nature serves to identify a particular source of a product [or service]." *Two Pesos, Inc. v.*

*Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). "An arbitrary mark applies a common word in an unfamiliar way." *Lane Capital Mgmt.*, 192 F.3d at 344. Plaintiff's REPUBLIC Marks are arbitrary since they consist of a common word—"Republic"—applied to music-related goods and services, which are unconnected to the normal usage of the word "Republic." *See Atl. Richfield Co. v. Arco Globus Int'l Co.*, 43 U.S.P.Q.2d 1574, 1579 (S.D.N.Y. 1997) ("The ARCO mark is an arbitrary or fanciful mark because it has no association with [Plaintiff's] particular product or service"). As arbitrary marks, Plaintiff's REPUBLIC Marks are conceptually strong. *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 118 (2d Cir. 1999) ("The strongest marks are arbitrary or fanciful marks, which are entitled to the fullest protection against infringement.")

Plaintiff's REPUBLIC Marks are also extraordinarily strong commercially as a result of (i) Plaintiff's use of the marks on a variety of goods and services that reach millions of consumers across the country, including on the covers of albums released by REPUBLIC's all-star roster of multi-platinum, award-winning artists; (ii) the substantial unsolicited press and industry awards given to the REPUBLIC label, including being named "Top Label of the Year" in 2015, 2016, 2018, 2019, and 2021 by *Billboard* magazine; and (iii) the enormous sales success of goods and services offered under Plaintiff's REPUBLIC Marks. (Lipman Decl. ¶¶ 15-21.)

Plaintiff has demonstrated that its REPUBLIC Marks are so strong that, should another party make use of the REPUBLIC mark for music-related goods and services, confusion is likely to result. *Virgin Enters.*, 335 F.3d at 148 ("Widespread consumer recognition of a mark previously used in commerce . . . increases the likelihood of consumer confusion if the new user is in fact not related to the first."). Accordingly, this factor weighs heavily in Plaintiff's favor.

### 2.   *The Parties' REPUBLIC Marks Are Identical and/or Highly Similar*

One of the most pivotal *Polaroid* factors is the degree to which the marks are similar. *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir.

2005) (noting that this factor is "[o]f salient importance among the *Polaroid* factors"). When the parties' marks are identical, this factor weighs heavily in favor of likelihood of confusion and "favor[s] the plaintiff as a matter of law." *Virgin Enters.*, 335 F.3d at 149.

Here, the parties' marks are identical, as they both use the mark REPUBLIC. Indeed, both Plaintiff's and Defendant's websites are filled with uses of the word mark REPUBLIC in connection with their respective music-related goods and services. (Lipman Decl. ¶¶ 8-9 & Exs. C-D; Nuzzaci Decl. ¶¶ 8, 10 & Exs. G, I.) To the extent the parties use different fonts and design elements, these differences are comparatively trivial since the parties are using the exact same name: REPUBLIC. *See Virgin Enters.*, 335 F.3d at 149 (noting that while "Defendants' logo used a different typeface and different colors from plaintiff's[,]" these differences "are quite minor in relation to the fact that the name being used as a trademark was the same in each case"—namely "both consisted of the same word, 'virgin.'"); *Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.*, 428 F.2d 379, 381 (2d Cir. 1970) (observing that when parties' products are discussed through word of mouth, "distinctive labels will be absent" and thus trademarks both consisting of the word HILLS will make "confusion virtually certain"). Because the parties are both using an identical mark, this critical factor weighs in favor of a likelihood of confusion.

     3.      <u>The Parties' Services Are Competitive and In Many Respects Identical and Offered to the Same Consumers</u>

Another critical factor in the *Polaroid* analysis is the relatedness of the parties' services. "To be 'related' for the purposes of trademark law, conflicting goods or services do not have to be in direct competition with one another." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 336 (S.D.N.Y. 2010). "Rather, the relevant question is whether they are so 'related' that a reasonable buyer is likely to think that a defendant's goods or services are somehow connected with or sponsored by the plaintiff, due to similar marks." *Museum of*

*Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 377 (S.D.N.Y. 2018). When the parties' services are related to each other, this factor weighs in plaintiff's favor; but when the parties' services are *identical*, this factor weighs *heavily* in plaintiff's favor. *Cline v. 1-888-PLUMBING Grp., Inc.*, 146 F. Supp. 2d 351, 367 (S.D.N.Y. 2001) (this factor "weighs heavily in Plaintiff's favor" where the parties "target the same consumers . . . for the same service.").

Through its REPUBLIC label, Plaintiff helps artists around the world by coordinating the production, manufacture, distribution, marketing, and promotion of their sound recordings and music videos. (Lipman Decl. ¶ 12.) These artists rely upon Plaintiff's label to broaden their fan base, market their albums, sell their merchandise, and promote their singles on streaming services, radio, and television. (*Id.*) In other words, Plaintiff literally invests in artists and their music under Plaintiff's REPUBLIC Marks. (*Id.* ¶ 14.) As a result, Plaintiff's REPUBLIC Marks appear on a wide variety of music-related goods and services, including song recordings, album covers, musical performances, event tickets, and merchandise. (*Id.* ¶ 15.)

With its newly-launched services, Defendant is using Defendant's REPUBLIC Marks in connection with services that likewise involve investments in artists, their music, and their ventures. Defendant will likely argue that its music services are "entirely different" from Plaintiff's goods and services—focusing on the technical and regulatory aspects of securities investing. (*See* ECF No. 17 at 2-3.) But these self-serving arguments should be disregarded. Before Plaintiff filed this lawsuit, Defendant's own marketing materials made clear that Defendant intends to compete directly with record labels like Plaintiff. For example, in the "manifesto" accompanying the launch of Defendant's new REPUBLIC-branded music services, Defendant essentially admitted the competitive proximity of the parties' services by stating that its REPUBLIC-branded music investment services are designed to "cut out the middleman"—

namely, the record label. (LaBarge Decl. ¶ 6 & Ex. B; Nuzzaci Decl. ¶ 11 & Ex. J.) Defendant

also marketed its REPUBLIC music services to artists, managers, and labels by claiming that

"the fans are your new ***record label***." (LaBarge Decl. ¶ 6 & Ex. B) (emphasis added). According

to Defendant's website, consumers who use its REPUBLIC-branded services would receive

access to "exclusive perks" such as "tickets and merch[andise] from the artists they back." (*Id.*;

Nuzzaci Decl. ¶ 10 & Ex. I.) These are the types of goods that are offered *by record labels*.

(Lipman Decl. ¶ 15.) The behind-the-scenes technical or regulatory aspects of how Defendant

operates its music-investing services are irrelevant; what matters is what *consumers see* when

they encounter Defendant's services in the marketplace. And when consumers see the name

REPUBLIC used in connection with the launch of a new sound recording or music video (*see*

Nuzzaci Decl. ¶ 12 & Ex. K), they will perceive that service to be identical to one offered by a

record label, such as the REPUBLIC label.

      Moreover, the artists whose songs Defendant has allowed or intends to allow consumers

to invest in—Lil Pump and KSHMR—fall into the same musical genres as some of Plaintiff's

artists (*i.e.*, rap and electronic dance). Indeed, two of the past collaborators shown on Lil Pump's

webpage on Defendant's website are artists currently signed to REPUBLIC, namely Nicki Minaj

and Drake. (Lipman Decl. ¶ 11; Nuzzaci Decl. ¶ 12 & Ex. K.) As such, the parties' services

involve the same types of artists, and target the same consumers, namely these artists' fans.

      In short, Defendant is using Defendant's REPUBLIC Marks in connection with a wide

variety of music-related services that are highly related to and in many respects identical to those

offered by Plaintiff under Plaintiff's REPUBLIC Marks and that are marketed to the same broad

category of consumers—namely, artists, managers, agents, and fans. This factor weighs heavily

in favor of Plaintiff.

4.      *The Quality of Defendant's Services Factor Favors Plaintiff*

This factor considers "whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995). Here, Defendant's music-related services offered under Defendant's REPUBLIC Marks are essentially brand new (only one song has been released to date), but that launch was riddled with complications and poorly-explained instructions resulting in consumer complaints. (Nuzzaci Decl. ¶ 12 & Ex. K.) Website shutdowns also plagued Defendant's launch. Defendant's Twitter page includes a re-tweet of @Republic_Help indicating that Defendant's website shutdown on November 3, just eight minutes before launch. (*Id.* ¶ 13 & Ex. L.) Accordingly, this *Polaroid* factor weighs in Plaintiff's favor. *See, e.g.*, *Am. Auto. Ass'n, Inc. v. Limage*, 15-CV-7386 (NGG)(MDG), 2016 WL 4508337, at *7 (E.D.N.Y. Aug. 26, 2016) (finding that consumer complaints, in part, "established a risk that [the plaintiff's] reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality.").

5.      *There Is No Gap to Bridge Since the Parties' Services are Competitive and In Many Respects Identical*

The "bridging the gap" factor "refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 74 (S.D.N.Y. 2021). This factor comes into play when a court finds the parties' goods and services to be unrelated. Here, because the parties use their respective marks for virtually identical purposes—namely, investing in artists and their music and ventures as well as providing merchandise, event tickets, and royalty payment services—there is no "gap to bridge," and this factor is not relevant to the likelihood of confusion analysis. *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir.

2005) (holding that because the parties' "products are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis in this case.").

Defendant will likely argue that this factor weighs in its favor because Plaintiff does not currently offer the type of SEC-regulated securities and NFT-related securities that Defendant offers. (*See* ECF No. 17 at 2.) But this argument is both beside the point and misses the point. Although Plaintiff itself is not an SEC-licensed security broker, there is no reason why Plaintiff could not partner with such a broker in the future. Moreover, Defendant ignores the fact that Plaintiff *has* already expanded into the NFT market and specifically, that the REPUBLIC label has facilitated the sale of NFTs by some of its artists. (Lipman Decl. ¶ 22; Nuzzaci Decl. ¶ 7 & Ex. F.) This factor weighs in Plaintiff's favor.

### 6.     *The Sophistication of Consumers Factor Favors Plaintiff*

This *Polaroid* factor examines the sophistication of the average consumer and the level of care they exercise when purchasing the products or services at issue. Here, Defendant's most recent investment opportunity permitted consumers to invest in Lil Pump's "Mona Lisa" song for only $100. (Nuzzaci Decl. ¶ 12 & Ex. K.) A $100 investment is not akin to a purchase of a car or home, where a consumer would be expected to exercise a high degree of care. *See, e.g.*, *Rosenthal A.G. v. Ritelite, Ltd.*, 986 F. Supp. 133, 145 (E.D.N.Y. 1997) (holding that sophistication of consumers factor favored plaintiff where "the relatively low cost of both parties' goods"—the most expensive of "which cost several hundred dollars"—"increases the likelihood that consumers will use little care in selecting the products and thus, that they may be confused as to the products' source"). Moreover, Defendant is not marketing its services to institutional investors looking at highly-regulated investment vehicles. As Defendant's (and its partner Opulous's) marketing materials show, Defendant's music services are designed to attract music fans without much thought, lured with the promise of "a trip to Paris," "clubbing with Lil

Pump," and social media contests (Nuzzaci Decl. ¶ 14 & Ex. M) — things a *record label* would do to promote the launch of a song or album. Seen in this light, fans looking to invest using Defendant's services are not going to spend time researching the details of their investment or exercising a high degree of care in making such an investment. This factor favors Plaintiff.

### 7. <u>Actual Confusion Occurred Instantly</u>

It is well-settled that "[t]he best evidence of likelihood of confusion is the occurrence of actual confusion and mistakes." *MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, 70 U.S.P.Q.2d 1046, 1049 (S.D.N.Y. 2004). Indeed, "[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion. Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004).

The Second Circuit has explained that courts should not apply an "inordinately narrow definition of actual confusion." *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 141 (2d Cir. 1999). This is because "[t]he purpose of both sections 32(1) and 43(a) is to prevent confusion regarding the source or sponsorship of goods and services among 'not only potential purchasers but also the general public.'" *Grand Heritage Mgmt., LLC v. Murphy*, 06-CV-5977 (NRB), 2007 WL 3355380, at *7 (S.D.N.Y. Nov. 7, 2007) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382-83 (2d Cir. 1997)). Indeed, the Second Circuit has made clear that "actual confusion need not be limited to evidence of mistaken completed transactions," but instead can also encompass "actual confusion regarding affiliation or sponsorship" between the parties and their goods and services offered under the marks at issue. *Morningside Grp.*, 182 F.3d at 141.

Here, the evidence of actual confusion presented by Plaintiff is overwhelming and highly probative of a likelihood of confusion—particularly since Defendant commenced its infringing activities only a short while ago. *See, e.g.*, *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 218 (2d Cir. 2003); *Heritage of Pride, Inc. v. Matinee NYC, Inc.*, 14-CV-4165 (CM), 2014 WL 12783866, at \*10 (S.D.N.Y. June 20, 2014) (factor weighed in plaintiff's favor where "over a relatively short period of time, there has already been actual confusion, even among sophisticated consumers.") Such actual confusion has ranged from a sophisticated trade industry database mistakenly including articles about Defendant's infringing activities under a profile page dedicated to Plaintiff's REPUBLIC label—*i.e.*, mistakenly thinking that Plaintiff *was* the one offering Defendant's services (LaBarge Decl. ¶ 9 & Ex. D), to a Twitter user tweeting about Defendant's music-related services and mistakenly thinking that Defendant's services emanate from Plaintiff (*Id*. ¶ 12 & Ex. G.) Even sophisticated online publications and websites providing coverage about Defendant felt the need to explain upfront that their articles were <u>*not*</u> about Plaintiff's REPUBLIC label—*i.e.*, an indication that the publication or website believed its readers <u>*would*</u> mistakenly think that services offered under Defendant's REPUBLIC Marks were related to Plaintiff's REPUBLIC label unless clarified. (*Id*. ¶¶ 10-11 & Exs. E-F.)

In addition, an executive at a company in the blockchain/cryptocurrency space mistakenly congratulated an executive from REPUBLIC about the success of *Defendant's* "Lil Pump initiative." (Lipman Decl. ¶¶ 29-30). This incident parallels an example of actual confusion that the Second Circuit found highly probative in the *Morningside* case. *See Morningside Grp*., 182 F.3d at 137 (fact that a financial professional called plaintiff to mistakenly congratulate it on an acquisition that defendant had made that had been picked up in the press was held to be "particularly" relevant evidence of actual confusion).

In light of the extensive actual confusion that has surfaced in the short period of time since Defendant commenced its infringing activities, this factor weighs in Plaintiff's favor.

        8.     *Defendant Acted in Bad Faith*

On October 8, 2021—almost one month before Defendant launched its REPUBLIC-branded music services via the Lil Pump investment opportunity—Plaintiff sent a cease-and-desist letter objecting to the use of Defendant's REPUBLIC Marks in connection with music-related services and requesting that Defendant operate its new music-related services under a non-REPUBLIC name. (LaBarge Decl. ¶ 13 & Ex. H). In response, Defendant stated it was open to an amicable resolution, initially leading Plaintiff to believe that Defendant would respect Plaintiff's longstanding rights and cease use of Defendant's REPUBLIC Marks in connection with its new music-related services. (*Id.* ¶ 14). Rather than continue the settlement discussions, on November 4, 2021—without any warning to Plaintiff—Defendant launched its new REPUBLIC-branded music services by opening the investment in Lil Pump's music. (*Id.* ¶ 17).

Defendant's decision to proceed full speed ahead despite Plaintiff's cease-and-desist letter is evidence of Defendant's bad faith and disregard for Plaintiff's rights. *See Microban Prods. Co. v. API Indus., Inc.*, 14-CV-0041 (KPF), 2014 WL 1856471, at *8 (S.D.N.Y. May 8, 2014) (failure to comply with cease-and-desist letter can support a finding of bad faith).

        9.     *The Balance of the Polaroid Factors Weighs in Plaintiff's Favor*

The clear weight of the *Polaroid* factors decidedly favors Plaintiff. As discussed above, seven of the factors weigh heavily in favor of a likelihood of confusion and the other factor either weighs in Plaintiff's favor or is irrelevant to the analysis. *None* of the *Polaroid* factors weigh in Defendant's favor. Indeed, three of the most critical *Polaroid* factors—strength of the plaintiff's mark, similarity of the parties' marks, and proximity of the parties' goods and services—all weigh *heavily* in Plaintiff's favor. Moreover, in the short period of time that

Defendant has been offering its infringing services, Plaintiff has provided evidence showing that actual confusion is occurring.

Plaintiff easily satisfies the requirement that it show a likelihood of success on the merits of its trademark infringement and unfair competition claims. Alternatively, the evidence indicates the existence of serious questions going to the merits of the case, and the balance of hardships weighs decidedly in Plaintiff's favor (as detailed below).

### III.   Plaintiff Is Suffering Irreparable Harm

The recently enacted Trademark Modernization Act of 2020 (the "TMA") codified a presumption of irreparable harm upon a showing of a likelihood of success on the merits in a trademark infringement case. Specifically, the TMA states in relevant part that "[a] plaintiff seeking any [] injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits . . . in the case of a motion for a preliminary injunction . . . ." 15 U.S.C. § 1116(a). Because Plaintiff has shown a likelihood of success on the merits of its infringement claims, irreparable harm is presumed and Plaintiff has satisfied this element. *See, e.g.*, *Rise&Shine Corp.*, 2021 WL 5173862, at *10 ("Because Plaintiff has shown a likelihood success on the merits of its federal trademark claim, Plaintiff is entitled to a presumption of irreparable harm.").

But even without the statutory presumption, Plaintiff has amply demonstrated that it will suffer irreparable harm absent the issuance of a preliminary injunction. Harm is irreparable "where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012). In trademark cases, "[t]he loss of reputation and goodwill constitutes irreparable harm." *Really Good Stuff, LLC v. BAP Investors, L.C.*, 813 F. App'x 39, 44 (2d Cir. 2020). Here, neither monetary damages nor a

permanent injunction would be sufficient to remedy the harm inflicted upon Plaintiff by Defendant's infringing activities since there is simply no way to measure or calculate the loss of goodwill in Plaintiff's REPUBLIC Marks if Defendant is permitted to continue using an identical mark on music-related services.

First, Defendant's offering of music-related services under Defendant's REPUBLIC Marks has caused—and will continue to cause—Plaintiff to lose its ability to control the reputation and goodwill associated with Plaintiff's REPUBLIC Marks and the REPUBLIC label. In the short time since Defendant launched its infringing services under Defendant's REPUBLIC Marks, there have already been many instances of actual confusion (*see supra* Section II.B.7.) By itself, this is enough to demonstrate irreparable harm. *See N.Y.C. Triathlon*, 704 F. Supp. 2d at 344 ("[S]trong evidence of actual consumer confusion" supports "findings of both likelihood of success on the merits and of irreparable harm."); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1359 (E.D.N.Y. 1994) (finding that evidence of actual consumer confusion "implores a finding of probable irreparable harm."). Moreover, since Plaintiff has no control over the quality of Defendant's music-related services, the reputation and goodwill of Plaintiff's REPUBLIC Marks is out of its own hands, which further constitutes irreparable harm. *See Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985) ("[I]rreparable injury[] exists in a trademark case when [plaintiff] shows that it will lose control over the reputation of its trademark pending trial. . . . Reputation is not calculable nor precisely compensable.").

Second, Plaintiff's REPUBLIC Marks and its REPUBLIC label are being associated with a set of services that are speculative and not of the highest quality (*see supra* Section II.B.4.) Plaintiff's REPUBLIC label prides itself on the attention and care it exhibits to market, promote,

and support its roster of award-winning artists. (Lipman Decl. ¶ 32.) The trust and relationship Plaintiff builds with its artists are fundamental to Plaintiff's and its artists' enormous success. (*Id.*) If Defendant fails to provide the support infrastructure necessary to help its artists become successful, it is likely that the artists—as well as the fans, who have invested in the musical project and have a monetary stake in the success of the endeavor—will be disappointed by the lack of popular success, monetary return, and/or overall experience. (*Id.*) And if these artists, fans, or investors mistakenly think that these disappointing services are offered by Plaintiff, it could lead to immeasurable harm for Plaintiff. *See N.Y.C. Triathlon*, 704 F. Supp. 2d at 343 ("prospective harm" to plaintiff's relationships with partners and sponsors "alone is sufficient to support a finding of irreparable harm"); *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) ("[I]f any infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market."); *Goldic Elec., Inc. v. Loto Corp.*, 00-CV-0028 (DC), 2000 WL 1880327, at *5 (S.D.N.Y. Dec. 28, 2000) ("One of the most important protections offered by the Lanham Act is the right of a trademark holder to control the quality of goods sold under its trademark.").

Finally, Defendant will likely argue that Plaintiff's request for preliminary injunctive relief is moot and/or that Plaintiff is not likely to suffer irreparable harm because Defendant took down or "altered the language" of some (but not all) of its prior marketing materials for its REPUBLIC-branded music services. (ECF No. 17 at 3.) But to avoid a preliminary injunction on grounds of cessation of infringement, "the offending conduct [i] must have ceased and [ii] the court must find that there is no reasonable expectation that it will resume." *Upjohn Co. v. Am. Home Prods. Corp.*, 598 F. Supp. 550, 554-55 (S.D.N.Y. 1984). Neither has been shown here.

The "offending conduct" is Defendant's offering of music-related services under the REPUBLIC

mark. While Defendant may have altered some of its prior marketing materials, the fact remains

that Defendant is still offering and promoting music-related services to this day under its

REPUBLIC name and mark. (Nuzzaci Decl. ¶ 12 & Ex. K.) Nor has Defendant shown that there

is "no reasonable expectation" that it will not continue to offer such services. To the contrary, as

recently as January 11, 2022, Defendant's CEO boasted about how it has "brought music

investing to the masses with major artists." (Nuzzaci Decl. ¶ 15 & Ex. N.)

Accordingly, Plaintiff is suffering irreparable harm and Defendant has made clear that it

will continue to cause such harm unless enjoined by this Court.

## IV.    The Balance of Hardships Tips Decidedly in Plaintiff's Favor

Under this factor, "courts must balance the competing claims of injury and must consider

the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat'l

Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Here, the balance of hardships favors Plaintiff.

Absent a preliminary injunction, Plaintiff will suffer irreparable harm (as detailed fully

above) due to, among other things, the loss of goodwill associated with Plaintiff's REPUBLIC

Marks and the loss of control over Plaintiff's own reputation. Conversely, if the Court grants the

requested relief, Defendant would merely be enjoined from using Defendant's REPUBLIC

Marks in connection with its new, music-related services but would otherwise be permitted to

continue offering its non-music related services under its REPUBLIC mark. In other words,

Defendant would not be substantially harmed by the issuance of a preliminary injunction—it

would simply have to change the name under which it offers its new music-related services. *See,

e.g.*, *Really Good Stuff*, 813 F. App'x at 49 (explaining that defendants "would not be severely

impacted because they could still sell other products that did not bear the infringing marks");

*Edom Labs., Inc. v. Special Tea Plus, Inc.*, 09-CV-5185 (SJF)(ETB), 2010 WL 596342, at *2 (E.D.N.Y. Feb. 16, 2010) ("Defendants will not be substantially harmed by the preliminary injunction because they may continue to sell their product under different names . . . .").

## V.     The Public Interest Would Be Served by the Requested Injunctive Relief

"[T]he public has an interest in not being deceived – in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon*, 704 F. Supp. 2d at 344. Due to the inevitable likelihood of confusion and actual confusion resulting from Defendant's use of Defendant's REPUBLIC Marks with music-related services, the public interest would be served by issuing a preliminary injunction. *See Vox Amplification Ltd. v. Meussdorffer*, 13-CV-4922 (ADS)(GRB), 2014 WL 558866, at *15 (E.D.N.Y. Feb. 11, 2014), *report and recommendation adopted*, 50 F. Supp. 3d 355 (E.D.N.Y. 2014) ("Due to the likelihood of confusion, and instances of actual confusion, in this case, the public interest would be served by issuing a preliminary injunction."). Thus, the final factor also weighs in favor of granting Plaintiff's request for preliminary injunctive relief.

## CONCLUSION

For the above reasons, Plaintiff respectfully requests that the Court grant a preliminary injunction against Defendant and such further relief as the Court deems necessary and proper.

Dated: New York, New York  
      January 24, 2022

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By: /s/ David Donahue
    David Donahue (*ddonahue@fzlz.com*)
    Jason D. Jones (*jjones@fzlz.com*)
    Daniel M. Nuzzaci (*dnuzzaci@fzlz.com*)
151 West 42nd Street, 17th Floor
New York, New York  10036
Phone: (212) 813-5900

*Attorneys for Plaintiff UMG Recordings, Inc.*