UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UMG RECORDINGS, INC.,

                 Plaintiff,

v.

OPENDEAL INC. D/B/A REPUBLIC,

                 Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7/5/2022_

21 Civ. 9358 (AT)

**ORDER**

ANALISA TORRES, District Judge:

    Plaintiff, UMG Recordings, Inc. ("UMG"), brings this action against Defendant, OpenDeal Inc. ("ODI"), asserting claims for trademark infringement, unfair competition and false designation of origin, in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125 *et seq.*, and parallel claims under New York state and common law.[1]  Compl. ¶ 8, ECF No. 1.  UMG moves for an order preliminarily enjoining ODI from using the trademarks "Republic" and "Republic Music" in connection with music-related goods and services during the pendency of this litigation.  UMG Mot., ECF No. 23.  For the reasons stated below, the motion is DENIED.

## BACKGROUND

    UMG is a major music company, which owns a number of record labels, including Republic Records.  Lipman Decl. ¶ 5, ECF No. 25.  Republic Records was founded in 1995, and provides a number of services to recording artists by "coordinating the production, manufacture, distribution, marketing, and promotion of their sound recordings and music videos."  *Id.* ¶¶ 11–12.  UMG owns five trademark registrations in connection with the Republic Records brand, including for the name "Republic Records," to describe "musical

---

[1] UMG's motion for a preliminary injunction is predicated solely on its claims for trademark infringement and unfair competition under the Lanham Act.  The Court, accordingly, addresses those claims only.  *See* UMG Mem. at 14 n.3, ECF No. 24.

sound recordings" and "production and publishing of music," as well as for a stylized "Republic Records" flag logo. LaBarge Decl. ¶ 4, ECF No. 26; *see also* ECF No. 26-2. UMG has held a trademark registration in the "Republic Records" logo since 2016, and in the mark "Republic Records" since 2018. LaBarge Decl. ¶ 4. UMG does not have a registered trademark in either a standalone "Republic" mark or logo. However, UMG has previously used a stylized, standalone "Republic" logo on some of their products, *see, e.g.*, ECF No. 38-2 at 11, 19, 21, and it is common for media coverage of the brand to use "Republic" as a shortform for "Republic Records," *see, e.g.*, ECF Nos. 27-2, 27-3, 27-4.

ODI is a financial technology firm that conducts business under the name "Republic." Rich Decl. ¶ 4, ECF No. 34. ODI manages several business lines, including, as relevant here, the Republic crowdfunding investment platform (the "Republic Platform"), which is operated by OpenDeal Portal, LLC, ("ODP"), a wholly-owned subsidiary of ODI. *Id.* ¶¶ 5, 8. Since 2016, the Republic Platform has offered the public opportunities to purchase interests, generally through securities crowdfunding, in a number of industries, including real estate, entertainment, and consumer products. *Id.* ¶¶ 4–6. In 2016, ODI filed—and received—trademark registrations in the name "Republic," to describe fundraising and crowdfunding services, and when used in their stylized "Republic" logo. *Id.* ¶ 13; *see also* ECF No. 34-1. ODI generally refers to investment opportunities in a particular industry (a "vertical") by the name "Republic" and a "plain language descriptor" of that industry, such as "Republic Real Estate" or "Republic Startups." Rich Decl. ¶ 12.

In order to offer crowdfunded securities offerings to the public, ODI and ODP have obtained licenses from the Securities and Exchange Commission (the "SEC"), and ODI has membership in the Financial Industry Regulatory Authority ("FINRA"). *See id.* ¶¶ 8–9. The

SEC license permits the Republic Platform to act as an intermediary for such crowdfunded securities offerings, allowing members of the public to invest in private markets—that is, investing in the equity and debt of privately-owned companies. *See id.* ¶ 9.  As a result, the Republic Platform is subject to ongoing FINRA and SEC audits and approval processes, and operates in compliance with SEC-promulgated regulations. *Id.*  And, although the public may make investments through the Republic Platform, users must register with ODP, create an investor profile with information that can be shared with securities regulators, make disclosures as to their income, net worth, and similar sensitive information, and answer a questionnaire on the risks and rules of securities crowdfunding.  *Id.* ¶ 10.

On October 7, 2021, ODI sent out an email announcing the launch of "Republic Music," which it described as a "way for artists to raise capital from their fans through investing, and in exchange, the fans receive equity in the rights to the royalties" from that artist's songs or albums.  ECF No. 26-4; LaBarge Decl. ¶ 7.  The same day, ODI published "The Music Investment Manifesto" (the "Manifesto"), describing its music investing opportunities.  Manifesto, ECF No. 27-11; *see also* Nuzzaci Decl. ¶ 11, ECF No. 27.  In essence, ODI allowed investors to purchase securitized non-fungible tokens[2] ("S-NFTs") in a particular artist's song or album, and "[e]ach time that song gets played, streamed, and licensed," that investor receives royalties from their S-NFTs.  Manifesto at 3–4.  Republic has, to date, made at least some music-related securities offerings, including most recently, on November 4, 2021, creating an opportunity for individuals to invest in a new single, "Mona

---

[2] "Non-fungible tokens" are units of data stored on a blockchain that are created to transfer ownership of physical objects or digital media.  Because NFTs can be easily sold and re-sold, with their transaction history stored on the blockchain, NFTs can function as investments that can store value and increase over time.  *See Hermes Int'l v. Rothschild*, No. 22 Civ. 384, 2022 WL 1564597, at *1 (S.D.N.Y. 2022).  Here, the S-NFT is a representation of a security interest in an artist's song or album, which "means the security that fans are purchasing is represented in their digital wallet and functions as a tool that can distribute royalty payments."  *See* Manifesto at 3.

3

Lisa," by the artist Lil Pump (the "Mona Lisa Offering"). Rich Decl. ¶ 18. That offering reached its target investment goal of $500,000 the same day it was launched. *Id.* ¶ 19.

UMG asserts that ODI's Republic-branded music-related investment offerings have caused consumer confusion as to the source of these opportunities. For instance, Avery Lipman, UMG's president, claims that in November 2021, when he met with executives from NiftyLabs, a blockchain company, they congratulated him on the Mona Lisa Offering, thinking Republic Records was behind the venture. Lipman Decl. ¶ 30. UMG also cites two news articles discussing the Mona Lisa Offering and the Republic Platform as examples of confusion, although both articles clearly note that Republic Records, the record label, is not associated with the investment offering. *See* ECF Nos. 26-6, 26-7.

On October 8, 2021, UMG sent ODI a cease-and-desist letter objecting to ODI's use of "Republic" in connection with music-related services "that are offered by a record label," and demanding that ODI cease such use. ECF No. 26-9. The same day, ODI ceased using the phrase "Republic Music" in connection with its social media, marketing materials, and websites, and removed the Manifesto from its website. *See* Kang Decl. ¶¶ 7, 13, ECF No. 35. On October 14, 2021, ODI added a disclaimer on its music-related investment vertical clarifying that the Republic Platform was distinct from Republic Records. *Id.* ¶ 9. And, on December 1, 2021, ODI deleted Republic's music investment page altogether. *Id.* ¶ 13.

## DISCUSSION

I. <u>Legal Standard</u>

A preliminary injunction is an "extraordinary remedy," never to be awarded as of right. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a plaintiff must show: "(1) irreparable harm; (2) either a likelihood of success on the merits or both

serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that [the requested relief] is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018).

A showing of irreparable harm is the "single most important prerequisite" for issuance of a preliminary injunction. *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d Cir. 1999). In trademark infringement cases, irreparable harm exists where the moving party "shows that it will lose control over the reputation of its trademark pending trial, because loss of control over one's reputation is neither calculable nor precisely compensable." *N.Y.C. Triathlon, LLC v. N.Y.C. Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010) (citation and quotation marks omitted). And, irreparable harm is presumed where the movant establishes a likelihood of success on the merits. *See* 15 U.S.C. § 1116(a). Conversely, where the movant fails to show a likelihood of success on the merits, they "cannot obtain a preliminary injunction without making an independent showing of likely irreparable harm." *Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 174 (2d Cir. 2000).

The moving party bears the burden of persuasion to demonstrate "by a clear showing" that the necessary elements are satisfied. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and emphasis omitted). And, in considering a motion for a preliminary injunction, unlike on a motion to dismiss, the Court need not accept allegations in the complaint as true. *Victorio v. Sammy's Fishbox Realty Co.*, No. 14 Civ. 8678, 2014 WL 7180220, at *4 (S.D.N.Y. Dec. 12, 2014) (citation omitted). Although the movant's burden at this stage is lower than at the summary judgment stage, they must still submit evidence sufficient for the Court to conclude that they are likely to prove both a likelihood of success on the merits, and a showing of

5

irreparable harm, by a preponderance of the evidence. *Engine Cap. Mgmt., LP v. Engine No. 1 GP LLC*, No. 21 Civ. 149, 2021 WL 1372658, at *5 (S.D.N.Y. Apr. 12, 2021).

II. Application

UMG seeks a preliminary injunction solely on the basis of its trademark infringement and unfair competition claims under the Lanham Act. *See* UMG Mem. at 14 n.3, ECF No. 24. Trademark infringement and unfair competition are evaluated under the same two-part test. *Hamilton Int'l Ltd. v. Vortic LLC*, 486 F. Supp. 3d 657, 669 (S.D.N.Y. 2020). On either claim, a plaintiff must demonstrate that "(1) it has a valid mark that is entitled to protection and that (2) the defendant's actions are likely to cause confusion with [that] mark." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (quotation marks and citation omitted). The Court addresses each prong in turn.

A. Protectability of Mark

The Lanham Act protects both registered and unregistered trademarks against infringement. *See, e.g.*, *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers*, 894 F. Supp. 2d 288, 304 (S.D.N.Y. 2012). In determining a trademark's protectability, the Court must "apprais[e] the trademark's inherent capacity to identify the source of a product and classify[] the trademark in one of four categories of inherent distinctiveness." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 310 (S.D.N.Y. 2000). These categories are "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful" marks, and this order represents, from weakest to strongest, "their eligibility to trademark status and the degree of protection accorded" to them. *Bristol–Myers Squibb Co., v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d Cir. 1992) (citing *Abercrombie & Fitch Co. v. Hunting World*, 537 F.2d 4, 9 (2d Cir. 1976)). Arbitrary marks, which "consist[] of a word that has a clear

6

meaning but which does not describe the product," are considered "inherently distinctive and are automatically entitled to protection." *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 531–32 (S.D.N.Y. 2012). In addition, a valid trademark registration creates the presumption that a mark is entitled to protection, thus relieving its owner of the need to demonstrate protectability. *Paco Sport*, 86 F. Supp. 2d at 311.

Here, it is undisputed that UMG owns a valid trademark registration in the "Republic Records" mark and its stylized flag logo, which cover various music-related goods and services. *See* ECF No. 26-2. And, the word "Republic" has a specific, well-known meaning, but it has no intrinsic relationship to records or music-related goods or services. *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 148–49 (2d Cir. 2003). The "Republic Records" mark is, therefore, entitled to protection both as an arbitrary mark, and based on its valid registration. UMG, however, claims that it also has common law trademark rights in a standalone "Republic" mark. UMG Mem. at 15; UMG Reply at 3–4, ECF No. 37. The Court disagrees.

"The Lanham Act's protection extends to unregistered, common law trademarks." *Marshak v. Schaffner*, No. 11 Civ. 1104, 2012 WL 1658393, at *4 (S.D.N.Y. May 11, 2012). Common law trademark rights "develop when goods bearing the mark are placed in the market and followed by continuous commercial utilization." *Buti v. Perosa, S.R.L.*, 139 F.3d 98, 103 (2d Cir. 1998) (citation omitted). Accordingly, UMG must show that its use of the standalone Republic mark "has been deliberate and continuous, not sporadic, casual or transitory." *Excelled Sheepskin & Leather Coat Corp. v. Ore. Brewing Co.*, 897 F.3d 413, 418 (2d Cir. 2018) (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 95 F.2d 1265, 1271–72 (2d Cir. 1974)).

UMG has put forth limited evidence that, at least in the early 2000s, it branded its products with a standalone "Republic" mark. *See, e.g.*, ECF No. 38-2 at 11, 19, 21. But, these examples are all nearly two decades old. *See id.* UMG does not identify any instances of its continuing to use this mark to identify its products and services in the marketplace in more recent years. *E.g.*, ECF No. 25-3. Rather, all of UMG's remaining examples only use "Republic" as a clearly-identified shortform for "Republic Records," after the full name or trademarked logo has been prominently introduced. *E.g.*, ECF Nos. 27-2, 27-3, 27-4. And, these examples are largely limited to media coverage, advertising, and social media promotion, *see, e.g*, ECF No. 25-5, which does not support that UMG's products or services themselves are branded with a standalone "Republic" mark, *see Paco Sport*, 86 F. Supp. 2d at 311 n.8 (noting "doubts" about protectability of PACO mark where "company only occasionally used the name PACO alone (not in conjunction with the name RABANNE)" and did so only in advertising and promotion, rather than product branding). This cannot be said to be the kind of "continuous commercial utilization" necessary to establish common law trademark rights. *Marshak*, 2012 WL 1658393, at *5 (citing *Buti*, 139 F.3d at 103). UMG has not, therefore, met its burden of demonstrating that it has protectible, common-law trademark rights in the "Republic" mark.

   B. Likelihood of Customer Confusion

Even assuming that UMG has valid trademark rights in the standalone "Republic" mark, ODI argues that UMG has failed to demonstrate a likelihood of confusion arising from ODI's alleged infringement of that mark. ODI Mem. at 12–29, ECF No. 33. The Court agrees. To assess the likelihood of confusion, the Court must apply the eight-factor balancing test described in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961).

*See Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016). The *Polaroid* factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Id.* (quoting *Starbucks Corp. v. Wolfe's Borough Coffee, Inc*., 588 F.3d 97, 115 (2d Cir. 2009)). The majority of these factors do not weigh in UMG's favor.

1. Strength of the Trademark

The strength of a trademark refers to a mark's "distinctiveness" or its ability to "identify goods sold under it as coming from one particular source." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998). A mark's distinctiveness is evaluated in terms of both its inherent distinctiveness, as well as its distinctiveness in the marketplace. *Id.* As discussed, "Republic Records" and "Republic" are arbitrary marks when used to describe music-related goods and services, and therefore, inherently distinctive. *See supra* at 7. But, even where a mark is deemed arbitrary, its reliance on a relatively common word dilutes the strength of the mark. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 281 (6th Cir. 1997). And, "the presumption of distinctiveness applies only to the trademark as a whole, and does not extend to its components." *See Paco Sport*, 86 F. Supp. 2d at 312. Thus, UMG cannot argue that "Republic" is distinctive solely based on the registration and use of the "Republic Records" mark, absent proof that the "Republic" mark has acquired secondary meaning. *See id.* (collecting cases). The Court must, therefore, assess the distinctiveness that UMG's claimed "Republic" mark has gained in the marketplace by

9

looking to whether it has acquired secondary meaning. *Strange Music v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 488–89 (S.D.N.Y. 2004); *see also Medici Classics Prods. LLC v. Medici Grp. LLC*, 590 F. Supp. 2d 548, 554 (S.D.N.Y. 2008).

The Second Circuit has enumerated six factors courts consider when evaluating secondary meaning: (1) the senior user's advertising and promotional expenses; (2) consumer studies linking the name to the source; (3) the senior user's sales success; (4) third-party uses and attempts to plagiarize the mark; (5) length and exclusivity of the mark's use; and (6) unsolicited media coverage of the products at issue. *Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985). Proof of secondary meaning "entails vigorous evidentiary requirements" *id.* (citation omitted), and UMG bears the burden of not only showing secondary meaning, but showing that its mark acquired secondary meaning before the alleged infringement began. *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F. Supp. 3d 606, 617 (S.D.N.Y. 2020).

UMG has not put forth sufficient evidence, at this stage, to demonstrate that "Republic" has acquired secondary meaning or gained distinctiveness in the marketplace. First, there is no evidence that UMG's products and services are widely identified by the "Republic" mark alone, particularly after October 2021, when the alleged infringement occurred. *See supra* at 8; *see also Girl Scouts of the United States of America v. Boy Scouts of America*, No. 18 Civ. 10287, 2022 WL 1047583, at *4–5 (S.D.N.Y. Apr. 7, 2022). *Cf. Lexington Mgmt. Corp. v. Lexington Cap. Partners*, 10 F. Supp. 2d 271, 280–81 (S.D.N.Y. 1998) (finding secondary meaning where company was "referred to only as 'Lexington'" in media coverage and generally known only by shortform in the industry).

Second, UMG adduces no compelling evidence, such as consumer studies, demonstrating that "the public strongly associates the [term 'Republic'] with the [Republic Records] brand." *Phillips-Van Heusen Corp. v. Calvin Clothing Co., Inc.*, 444 F. Supp. 2d 250, 255 (S.D.N.Y. 2006) (citing consumer surveys establishing public's association of "Calvin" name with "Calvin Klein" brand to find secondary meaning).

Third, the Court "cannot infer secondary meaning" from UMG's proffered examples of "media references to [Republic Records] as ['Republic'] because the submitted stories also invariably mention the full name" prominently. *Paco Sport*, 86 F. Supp. 2d at 314; *see also Knights Armament Co. v. Optical Sys. Tech., Inc.*, 647 F. Supp. 2d 1321, 1331 (M.D. Fla. 2009) (no secondary meaning where movant "consistently uses [shortform] in conjunction with, and as an abbreviation of [the full name]"). These references do not support the inference that ordinary consumers associate the common word "Republic" exclusively with UMG, its products, or its services. *Paco Sport*, 86 F. Supp. 2d at 313.

Finally, the Court notes that, beyond the affidavit of UMG's president, Lipman, UMG does not put forth specific evidence of its advertising and promotional expenses, sales successes, "exclusivity of use of," or "third-party uses and attempts to plagiarize" the Republic mark.[3] *Thompson Med. Co., Inc.* 753 F.2d at 217. *See generally* Lipman Decl. And, each of Lipman's cited examples—largely, media coverage of accolades and industry awards UMG has received—refer prominently to "Republic Records," using "Republic" only as a clearly

---

[3] To whatever extent Lipman's affidavit discusses these factors, his statements are largely conclusory and unsupported by admissible evidence. For instance, he states, providing no support, that Republic Records' annual net sales "from 2018 to 2020 exceeded hundreds of millions of dollars." Lipman Decl. ¶ 21. Such statements are insufficient to meet the "vigorous evidentiary requirements" necessary to demonstrate secondary meaning. *Thompson Med.*, 753 F.2d at 217.

11

identified shorthand thereafter, which proves nothing about the secondary meaning "Republic" has acquired in the marketplace. This factor, therefore, does not weigh in UMG's favor.

2. Similarity of the Marks

This factor looks to (1) "whether the similarity between the [parties'] marks is likely to cause confusion" and (2) "what effect the similarity has upon prospective purchasers." *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 962 (2d Cir. 1996). "In evaluating similarity, a court looks at how a mark as a whole sounds, looks and feels—reviewing the size of a mark, design of a logo, the typeface, [and] how a word sounds when spoken." *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 587 (S.D.N.Y. 2015).

The "obvious similarity" between UMG's and ODI's marks is that they "both employ the word [Republic]." *Medici Classics Prods.*, 590 F. Supp. 2d at 554. But, use of the same word "does not necessarily make the marks similar for purposes of assessing confusion under a *Polaroid* analysis." *Id.* The Court finds that UMG's and ODI's marks are sufficiently distinct as presented in the marketplace. First, the parties' logos are distinguishable in their color scheme, font, and layout. UMG's registered mark parallels a black-and-white American flag design, with the word "republic" appearing prominently in lowercase letters over the top third of the flag.[4] Its earlier, unregistered "Republic" logo also commonly appears in black-and-white, and includes the word "Republic" written in an italic font, with a star symbol over the letter "i." In contrast, ODI's logo is a blue rectangle, with the word "Republic" printed in white, next to a stylized, prominent letter "R," composed of intersecting blue triangles and other shapes.

---

[4] The Court further notes that the use of the word "Records" in the "Republic Records" logo and name clearly serves a differentiating role between UMG's mark, which applies solely to music and entertainment-related goods and services, and ODI's standalone "Republic" mark for its investment platform, which covers a much broader array of industries. *Cf. Morningside Grp. Ltd. v. Morningside Cap. Grp. LLC*, 182 F.3d 133, 140 (2d Cir. 1999).

  

Visually, UMG's marks are "stark[ly] different" from ODI's mark, which establishes that, "as presented in the marketplace, the marks are not similar to a significant degree." *Engine Cap. Mgmt.*, 2021 WL 1372658, at *8. This is significant, because the parties' respective logos are prominently shown in connection with their products and services, on their respective websites and social media, and in media coverage of each entity. *E.g.*, Lipman Decl. ¶ 15 (showing logo on Taylor Swift and Ariana Grande albums produced by UMG); ECF No. 25-2 (prominently displaying logo in connection with coverage of Republic Records as "top label of the year"); ECF Nos. 25-4, 25-5 (showing logo on website and social media).[5] *See also* Manifesto at 1; ECF No. 27-10 (showing ODI's logo on website); ECF Nos. 27-12; 34-3 (showing ODI's logo on Mona Lisa Offering investment application and webpage). UMG has identified almost no instances in which the term "Republic" is used to identify its products and services—either by UMG, or third-parties—without the full "Republic Records" logo or mark accompanying it, which minimizes the likelihood of confusion between the parties' products and services.

In addition, UMG has not demonstrated that its mark "will often, if not always be perceived aurally,"—the most likely form of confusion between the marks—because both

---

[5] UMG cherry-picks three media articles which discuss Republic Records' activities without use of their logo. *See* ECF Nos. 25-6, 25-7, 25-8. But, each of these articles explicitly refers to "Republic Records," and uses "Republic" as a shortform of that mark. The use of "Records" in itself distinguishes UMG's music-related goods and services from ODI's "Republic" securities-related products. *See Engine Cap. Mgmt.*, 2021 WL 1372658, at *7. Given that UMG has provided almost no examples where either it, the media, or consumers refer to its products by the term "Republic" without first using "Republic Records," these examples do not demonstrate similarity between UMG's and ODI's marks as they appear in the marketplace.

parties receive print media coverage, rely on internet advertising, and use their logos on their products, websites, and other public-facing materials. *Cf. Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 284; *Virgin Enters. v. Nawab*, 335 F.3d 141, 149 (2d Cir. 2003). The parties' marks "do not create the same overall impression, and their appearance in the marketplace is unlikely to confuse consumers." *Strange Music*, 326 F. Supp. 2d at 491. This factor too, therefore, weighs against UMG.

        3.  Proximity

Proximity in the marketplace assesses the extent to which the parties' products compete with each other. *Real News Project, Inc. v. Independent World Television, Inc.*, 08 Civ. 4322, 2008 WL 2229830, at *16 (S.D.N.Y. May 27, 2008). The Second Circuit has made clear that the central concern here is the "likelihood that customers may be confused as to the *source* of the products, rather than as to the products themselves," that is, whether a purchaser "could easily assume that, while the [products] themselves are different, they belong to the same genre of products and might well have the same source." *Arrow Fastener Co. Inc. v. Stanley Works*, 59 F.3d 384, 396 (2d Cir. 1995) (citation omitted) (emphasis in original).

UMG argues that proximity in the marketplace is established because ODI offers music-related investment opportunities to consumers, and UMG's record label "literally invests in artists and their music." UMG Mem. at 18–19. But, "the fact that both parties' products exist within the same industry is not enough." *Strange Music*, 326 F. Supp. 2d at 491 (collecting cases). The products and services offered by the parties differ significantly. It is undisputed that ODI does not provide the kinds of services UMG provides through Republic Records, including producing, manufacturing, distributing, marketing, and promoting artists' sound recordings and music videos, as well as selling music directly to consumers. *See*

Lipman Decl. ¶ 12.  Instead, ODI, through Republic, operates the Republic Platform, which offers the public investment opportunities to purchase interests in revenue-bearing assets, generally through securities crowdfunding—that is, allowing the public to invest in artists' songs or albums, with the promise of royalties when such songs are played or licensed.  Rich Decl. ¶¶ 6, 18–20; ECF No. 27-11.  ODI clearly does not produce, distribute, or manufacture sound recordings or music videos, or offer these goods or services to its clientele.  Rich Decl. ¶ 20.  And, as UMG concedes, it "does not currently offer the type of" investment opportunities ODI offers through Republic, nor does it possess the requisite SEC licensing or credentials to undertake such offerings.  *See* UMG Mem. at 22.

UMG also does not demonstrate that Republic Records and the Republic Platform "provide essentially the same service to the same customer base."  *Morningside Grp.*, 182 F.3d at 140.  Although Republic Records sells music directly to consumers, its services are primarily marketed towards recording artists, who in turn, use Republic Records' services to "broaden their fan base, market their albums, sell their merchandise, and promote their singles."  *See* Lipman Decl. ¶¶ 11–12.  The Republic Platform, by contrast, advertises its crowdfunding opportunities to the general public, and requires users to go through various registration requirements to become "investors" and participate in its offerings.  Rich Decl. ¶ 10.

It is conceivable that there may ultimately be some overlap between the parties' consumers—for instance, fans of a popular artist may both purchase that artist's music through Republic Records, and make crowdfunded investments in recordings by that artist through the Republic Platform.  But, such scenarios remain hypothetical because UMG does not demonstrate that Republic currently offers any investment opportunities in artists or bands

15

represented by Republic Records. At best, UMG argues that Republic offers investing opportunities in artists that "fall into the same [broad] musical genres as some" of their artists, and some of Republic Records' artists are "collaborators" with artists making offerings through the Republic platform. UMG Mem. at 20. These generic assertions do not, however, establish that customers will be confused as to the "source" of Republic's investment offerings, particularly when UMG offers no compelling evidence of such confusion, as discussed *infra*. *See Strange Music*, 326 F. Supp. 2d at 491–92. This factor, therefore, does not weigh in UMG's favor.

4. Actual Customer Confusion

UMG's evidence of actual consumer confusion is extremely minimal. UMG has failed to introduce "survey evidence, empirical studies, or expert testimony to suggest that the public is or is likely to be confused," the absence of which is "significant." *Atl. Richfield Co. v. Arco Globus Int'l Co., Inc.*, No. 95 Civ. 6361, 1997 WL 607488, at *8 (S.D.N.Y. May 29, 1997). To warrant equitable relief, UMG only need demonstrate a likelihood of confusion, rather than actual confusion. *Universal City Studios, Inc. v. T-Shirt Gallery, Ltd.*, 634 F. Supp. 1468, 1478 (S.D.N.Y. 1986). But, the Court "may properly infer no likelihood of consumer confusion from this absence of survey evidence." *Id*. Generously construed, UMG's evidence amounts to five instances of confusion—two of which explicitly distinguish Republic Records from the Republic Platform, noting that the former is unaffiliated with the latter's investment opportunities. Lipman Decl. ¶¶ 29–31; ECF Nos. 26-6, 26-7, 26-8. A "handful of instances of confusion is "insufficient" at the preliminary injunction stage to support a likelihood of consumer confusion, particularly when UMG puts forth no evidence that its consumers' purchasing decisions have been "influenced by this confusion." *Strange Music*, 326 F. Supp.

16

2d at 493–94; *see also Engine Cap. Mgmt.*, 2021 WL 1372658, at *8 (collecting cases). This factor, accordingly, weighs in ODI's favor.

### 5. Bad Faith

In assessing bad faith, courts look to "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [its] and the senior user's product." *Sports Auth.*, 89 F.3d at 964. There is no evidence supporting the proposition that ODI chose its Republic mark because it sought to capitalize on UMG's reputation and goodwill within the music industry. To the contrary, ODI has utilized the Republic mark on a wide range of investment opportunities in other industries. Rich Decl. ¶¶ 6, 12. In addition, the Court declines to impute bad faith based on ODI's actions during this litigation when the record demonstrates that, almost immediately after receiving UMG's cease-and-desist letter, ODI consulted with counsel, responded to that letter, and took a number of remedial measures, including removing its Republic Music page and the Manifesto from its website. Kang Decl. ¶¶ 7–13. *Cf. Microban Prods. Co. v. API Industries, Inc.* No. 14 Civ. 41, 2014 WL 1856471, at *8 (S.D.N.Y. May 8, 2014) (finding bad faith where "defendants have failed to comply with cease-and-desist letters without consulting counsel"). This factor also weighs in ODI's favor.

### 6. Quality of the Products

This factor assesses whether the inferior quality of a junior user's goods could jeopardize the senior user's reputation. *Arrow Fastener*, 59 F.3d at 398. UMG has not shown that ODI's products or services are of such "poor quality or inferior to [UMG's] such that [UMG's] reputation is at risk." *Engine Cap. Mgmt.*, 2021 WL 1372658, at *10. UMG's submissions are "devoid of non-conclusory facts or evidence regarding the quality of its [own]

17

products versus those of [ODI]." *Kohler Co. v. Bold Int'l FZCO*, 422 F. Supp. 3d 681, 730 (E.D.N.Y. 2018). Indeed, UMG relies solely on conclusory allegations that the Mona Lisa Offering was "riddled with complications and poorly-explained instructions," Compl. ¶ 35, even as it acknowledges that ODI "hit its maximum fundraising goal of $500,000 within two hours" of the Mona Lisa Offering's launch—hardly evidence of a fatally flawed product, *id.* ¶ 34. The Court, accordingly, has "no basis to infer that the relative quality of the products weighs in favor of a likelihood of confusion," and this factor too, does not weigh in UMG's favor. *Kohler*, 422 F. Supp. 3d at 730.

    7. Balancing the Factors

In general, strength, similarity of marks, and proximity of products are the three *Polaroid* factors "most significant in determining the likelihood of confusion,"—none of which weigh in UMG's favor. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987). Even assuming that the remaining *Polaroid* factors—namely, bridging the gap and the sophistication of customers—weigh in UMG's favor, on balance, the Court cannot conclude that there is a "likelihood that a significant number of consumers will be confused by the use of an allegedly infringing mark." *The Deal, LLC v. Korangy Publ'g, Inc.*, 309 F. Supp. 2d 512, 530 (S.D.N.Y. 2004) (emphasis omitted). And, as noted, UMG has not met its initial burden of demonstrating that it has valid trademark rights in the standalone "Republic" mark. The Court finds, therefore, that UMG has failed to demonstrate a likelihood of success on the merits of its claims.

Even assuming UMG has raised sufficiently serious questions going to the merits, it has not shown a balance of hardships tipping decidedly in its favor. ODI refers to all of its investment verticals by the name "Republic" and a "plain language descriptor" of that

industry, such as "Republic Real Estate" or "Republic Startups." Rich Decl. ¶ 12. Prohibiting ODI from using "Republic" or "Republic Music" for its music investment vertical would require ODI to essentially re-brand and create a new website and investment platform solely for its music-related offerings. It may also have to deal with the complexities of obtaining the requisite SEC and FINRA licensing to operate this new platform under a different name—potentially expensive, and time-consuming propositions. ODI Opp'n at 32-33, ECF No. 33. This creates a "greater hardship than [UMG] suffering such confusion or dilution (if any) that might possibly occur prior to trial." *Brennan's, Inc. v. Brennan's Rest. LLC*, No. 02 Civ. 9858, 2003 WL 1338681, at *7 (S.D.N.Y. 2003), *aff'd* 360 F.3d 125 (2d Cir. 2004).

### C. Irreparable Harm

Under the Lanham Act, a rebuttable presumption of irreparable harm arises where a plaintiff demonstrates a likelihood of success on the merits. 15 U.S.C. § 1116(a). UMG has not made that showing, and therefore, is not entitled to the presumption. UMG nevertheless argues it will suffer irreparable harm from a loss of "reputation and goodwill." UMG Mem. at 26–27; *see also Really Good Stuff, LLC v. BAP Investors, L.C.*, 813 F. App'x 39, 44 (2d Cir. 2020). But, UMG offers only "conclusory statements of loss of reputation," which "will not justify an irreparable harm finding." *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, No. 10 Civ. 3314, 2015 WL 4033019, at *12 (S.D.N.Y. June 29, 2015); *see* Lipman Decl. ¶¶ 30–31,

First, UMG argues that its evidence of "actual customer confusion" establishes irreparable harm. UMG Mem. at 27. But, "evidence of customer confusion is not equivalent to evidence of irreparable harm," particularly where, as here, at least two of UMG's five examples of confusion explicitly state that the Republic Platform is unrelated to Republic

Records. *Engine Cap. Mgmt.*, 2021 WL 1372658, at *12. Second, UMG vaguely discusses wholly speculative fears of "prospective harm" if ODI's products or services lack the "infrastructure necessary to help its artists become successful," because such artists, or their fans and investors, may "mistakenly think that these disappointing services are offered by [UMG]." UMG Mem. at 28. But as discussed, UMG has adduced no evidence demonstrating that ODI's products or services are of such inferior quality that they pose a risk to UMG's reputation. *See supra* at 17–18. And, such speculation falls far short of UMG's burden to demonstrate that irreparable harm is "likely in the absence of an injunction." *Winter*, 555 U.S. at 21–22 (emphasis omitted).

Because UMG has failed to establish certain and imminent irreparable harm from ODI's use of the allegedly infringing "Republic" mark—the "single most important prerequisite for issuance of a preliminary injunction," *Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) —its motion must fail. *Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446, 453 (S.D.N.Y. 2011).[6]

## CONCLUSION

For the reasons stated above, UMG's motion for a preliminary injunction is DENIED. The Clerk of Court is directed to terminate the motion pending at ECF No. 23.

SO ORDERED.

Dated: July 5, 2022
New York, New York

_____
ANALISA TORRES
United States District Judge

---

[6] Because the Court finds that UMG demonstrates neither a likelihood of success on the merits, nor a showing of irreparable harm, it does not address the remaining factors in the preliminary injunction analysis.